IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE 1, representing herself and on behalf of her son, JOHN DOE 1;<br><br>JANE DOE 2, on behalf of her son, JOHN DOE 2;<br><br>JANE DOE 3, representing herself and on behalf of her son, JOHN DOE 3;<br><br><br>JOHN DOE 4, on behalf of his son JOHN DOE 5;<br><br>JANE DOE 4, representing herself and on behalf of her brothers, JOHN DOE 6 and JOHN DOE 7,<br><br>       Plaintiffs,<br><br>    v.<br><br>NICOLÁS MADURO MOROS,<br><br>       Defendant. | **COMPLAINT FOR EXTRAJUDICIAL KILLING AND TORTURE**<br><br>JURY TRIAL DEMANDED<br><br><br>CASE NO. |

**PRELIMINARY STATEMENT**

Between 2017 and 2021, an elite branch of the Venezuelan National Police known as the Special Action Forces (*Fuerzas de Acciones Especiales*, or "FAES"), acting under the command and control of the then-President of Venezuela, Nicolás Maduro Moros ("Defendant" or "Defendant Maduro"), executed the sons of Plaintiffs Jane Doe 1, Jane Doe 2, Jane Doe 3, and John Doe 4, and the brothers of Jane Doe 4 (collectively with Jane Doe 1, Jane Doe 2, Jane Doe 3, and John Doe 4, "Plaintiffs"). This action is brought by Plaintiffs under the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note, on behalf of their executed family members. Plaintiffs Jane Doe 1, Jane Doe 3, and Jane Doe 4 additionally bring an action under the TVPA for the torture they experienced in connection with the execution of their family. Plaintiffs seek

1

compensatory and punitive damages against Defendant Maduro, who was President of Venezuela between 2013 and 2026, until his seizure and detention by the United States, and all available relief under federal law.

**JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction over Plaintiffs' claims of torture under 28 U.S.C. § 1331, as these actions arise under the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

2. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3). Upon information and belief, Defendant Maduro is presently detained at the Metropolitan Detention Center in Brooklyn, New York. Thus, Defendant is subject to this Court's jurisdiction.

**PARTIES**

3. Plaintiff Jane Doe 1 is a Venezuelan citizen, and the mother of deceased John Doe 1, who was in his early 20s when he was executed. In December 2017, FAES illegally entered Jane Doe 1's home and forced her outside, separating her from her son, who remained in the home. The officers then executed John Doe 1 inside their home. His murder was one of dozens committed by the same unit of Venezuelan security officers in their neighborhood. Jane Doe 1 has since attempted to seek justice for her son's killing, but her attempts have been stymied by the lack of an independent judiciary in Venezuela, which functions as a political arm of the ruling party. Jane Doe 1 remains in Venezuela with significant concerns for her personal and family's safety.

4. Plaintiff Jane Doe 2 is a Venezuelan citizen, and the mother of deceased John Doe 2, who was in his mid-20s when he was executed. In September 2018, John Doe 2 was stopped by FAES as he passed through a neighborhood on the way to his home. During the

2

encounter, FAES accused John Doe 2 of being criminally affiliated, forced him to the ground, and beat him. They then shot him at close range and transported him to the hospital but prevented medical care; he died while there. Jane Doe 2 has reported her son's murder to prosecutors and other investigators, but her efforts to hold her son's killers accountable have been futile. Jane Doe 2 remains in Venezuela and continues to fear for her safety.

5. Plaintiff Jane Doe 3 is a Venezuelan citizen, and the mother of deceased John Doe 3, who was in his early 30s when he was executed. In June 2019, FAES illegally raided John Doe 3's home, stole from him, beat him, and shot him. He died at the scene from his wounds before the officers transported his deceased body to the hospital. Later that morning, a neighbor alerted Jane Doe 3 that FAES was at her son's home; she immediately went to the scene, where she was arbitrarily detained by FAES. Jane Doe 3 did not learn her son was dead until hours after his execution, when relatives tried to locate her son at a local hospital. She was so distraught she immediately fainted and required medical attention. Prosecutors actively avoided meeting with her and refused to advance her case. Jane Doe 3 has since fled Venezuela and presently resides in Spain.

6. Plaintiff John Doe 4 is a Venezuelan citizen and the father of deceased John Doe 5, who was in his mid-20s when he was executed. In September 2020, two FAES officers illegally entered John Doe 5's home, forced him to his knees, and murdered him. FAES then transported John Doe 5 to the hospital, even though he was already deceased. John Doe 4 later went to the hospital and saw John Doe 5's body. He was distraught. After killing John Doe 5, FAES threatened and intimidated John Doe 4's second son. John Doe 4 and his second son live today in persistent and significant fear for their lives. John Doe 4 remains in Venezuela and continues to experience serious security concerns.

7.    Plaintiff Jane Doe 4 is a Venezuelan citizen and the sister of deceased John Does 6 and 7, who were in their early 20s and mid-teens, respectively, when they were executed. In January 2021, FAES conducted a mass, multi-day raid in the neighborhood in which Plaintiff Jane Doe 4, her brothers, and other relatives lived. During the raid, FAES entered Plaintiff Jane Doe 4's relative's home, where John Does 6 and 7 had taken shelter. The FAES officers forced both John Does 6 and 7 to their knees and executed them. Meanwhile, while trying to rescue her brothers from FAES, Plaintiff Jane Doe 4 was brutally and repeatedly beaten by other FAES officers. She overheard the gunshots that killed her brothers and witnessed the removal of the bloodied body of one of her brothers; she could not identify which one. She later discovered that both her brothers had been killed, and she identified their deceased bodies in the days following their executions. Prosecutors consistently rebuffed Jane Doe 4's attempts at reporting her brothers' executions. Jane Doe 4 has since fled Venezuela due to ongoing fears for her life and relocated safely in another country in Latin America.

8.    Defendant Nicolás Maduro Moros is a Venezuelan citizen who is presently detained at the Metropolitan Detention Center in Brooklyn, New York, located at 80 29th Street, Brooklyn, NY 11232. Between 2013 and 2026, until his seizure and detention by United States forces, he was President of Venezuela.

9.    At all relevant times from 2017 through 2021, Defendant possessed and exercised command and control of the Venezuelan security forces, including the FAES officers who killed Plaintiffs' sons and brothers and tortured Plaintiffs Jane Doe 1, Jane Doe 3, and Jane Doe 4.

**FACTUAL ALLEGATIONS**

10.    The security force responsible for the torture and extrajudicial killings alleged herein is the Venezuelan Special Action Forces (*Fuerzas de Acciones Especiales*, or "FAES").

4

Defendant Maduro established FAES in 2017, as a special tactical unit of the National Bolivarian Police. The purported aim of FAES was to reduce drug trafficking and criminal organizations. Maduro used FAES as a political instrument and mechanism of social control to violently suppress dissent, terrorize low-income neighborhoods, and eliminate political opposition. In fact, FAES is widely considered a "death squad" or "extermination group."[1]

11.  In 2019, the United Nations High Commissioner for Human Rights documented that FAES's extrajudicial executions fell into a systematic pattern. FAES units routinely targeted young, impoverished men living in low-income neighborhoods. FAES would arrive in its target neighborhood in black pickup trucks, without license plates, and block access to the area. The officers themselves would be disguised by dressing in black, carrying no identification, and wearing facemasks, such as balaclavas. They frequently were armed with long guns.[2]

12.  FAES officers would then force entry into victims' homes, steal their belongings, and engage in violence against women and girls, including sexual assault, forced nudity, and threats of rape.[3] The officers would often beat young men targeted for execution before separating them from family members and executing them.[4]

---

[1] Off. of the High Comm'r for Hum. Rts., *Human Rights in the Bolivarian Republic of Venezuela*, U.N. Doc. A/HRC/41/18, ¶ 47 (Oct. 9, 2019), https://docs.un.org/en/A/HRC/41/18 [hereinafter OHCHR, A/HRC/41/18]; Rebecca Hanson & Verónica Zubillaga, *From carceral punitivism to systematic killing: The necropolitics of policing in post-Chávez Venezuela*, 2 Violence: An Int'l. J. 65, 78 (2021).

[2] *Id*. at ¶ 48.

[3] *Id.*; Hum. Rts. Council, *Report of the independent international fact-finding mission on the Bolivarian Republic of Venezuela*, U.N. Doc. A/HRC/54/57, ¶¶ 46-48 (Sept. 18, 2023), https://www.ohchr.org/sites/default/files/documents/hrbodies/hrcouncil/sessions-regular/session54/advance-versions/A_HRC_54_57_AdvancedUneditedVersion.pdf [hereinafter HRC, A/HRC/54/57].

[4] OHCHR, A/HRC/41/18, at ¶ 48.

13.     In every case documented by the United Nations High Commissioner, FAES agents tampered with the scene of the crime after killing their targets. This included planting weapons and drugs at the scene and firing weapons in the air or against walls to fabricate that the victim had "resisted authority." Victims frequently were brought to the hospital—despite being already deceased—as a method of obscuring the true nature of the executions.

14.     In addition, FAES would often attempt to blame their victims for their illegal conduct. FAES justified its extrajudicial murders based on the alleged criminal history of the victims. FAES's official accounts of its executions were never investigated by the government authorities.[5]

15.     Following the executions, FAES would classify the killings as the result of "resistance to authority" to justify the purported "tough-on-crime" operations. In 2018, the Government of Venezuela registered 5,287 killings by security forces, including FAES, as "resistance to authority." Well-respected nongovernmental organizations have reported that these types of killings were even higher, at 7,523.[6] Killings by security forces branded as "resistance to authority" have remained in the thousands per year through 2022.[7] The latest available data

---

[5] *Id.* at ¶ 49.

[6] *Id.* at ¶ 50.

[7] United Nations Hum. Rts. Council, *Detailed findings of the independent international factfinding mission on the Bolivarian Republic of Venezuela*, U.N. Doc. A/HRC/45/CRP.11, ¶¶ 1006-1014 (Sept. 15, 2020), https://www.ohchr.org/sites/default/files/Documents/HRBodies/HRCouncil/FFMV/A_HRC_45_CRP.11.pdf [hereinafter UNHRC, A/HRC/45/CRP.11]; Observatorio Venezolano de Violencia [OVV], *Informe Anual de Violencia* dated 2017-2022 (reporting 5,535 "resistance to authority" deaths in 2017; 7,523 in 2018; 5,286 in 2019; 4,231 in 2020; 2,332 in 2021; and 1,240 in 2022).

from 2023 suggests the reported numbers of deaths by police intervention have fallen to just below 1,000 individuals.[8]

**Historical and Political Context**

16. The events underlying the present complaint were initiated by then-President Hugo Chávez naming Defendant Nicolás Maduro Moros, then-Vice President, as his replacement. The announcement came just before Chávez suffered health complications that left him hospitalized until his death in early March 2013.

17. An election took place on April 14, 2013. Defendant Maduro, representing the incumbent party, ran against Henrique Capriles, the opposition party leader. The voter turnout reached eighty percent participation. The National Electoral Council (*Consejo Nacional Electoral*, or "CNE") announced the results that evening, reporting that Maduro had won by 1.49 percentage points.

18. Capriles rejected the election results and called for a recount, citing thousands of reports of irregularities on voting day. As a result, tens of thousands of Venezuelans took to the streets to protest and were met with a massive and violent response from Venezuelan security units. These security units used disproportionate and brutal force against peaceful protesters, beating them and firing tear gas cannisters, rubber bullets, and live ammunition into the crowds. Many protesters were arbitrarily detained and then subjected to torture during their detention. Several people died in the protests.

19. This violent response was a harbinger of what was to come under the Maduro administration: systematic repression and brutality. Freedom for civil society in Venezuela was

---

[8] OVV, Annual Report Violence 2023, https://observatoriodeviolencia.org.ve/news/annual-report-violence-2023/ (reporting 953 deaths involving police intervention).

and is limited, as State violence, arbitrary detention, extrajudicial killing, torture, and excessive use of force on the part of security forces were rampant.[9] Accountability for these human rights violations remains effectively impossible in Venezuela due to the corruption of the judicial process and the lack of independence of the judiciary and prosecutorial entities.[10]

20. Defendant Maduro retained power in Venezuela by compromising election integrity.[11] In the last presidential election in 2024, he again was declared the winner despite preventing rivals from running for office and releasing no information on the election results. Leading international organizations have declared the 2024 election illegitimate.[12] Once again, protesters were met with massive government-initiated violence, including killings, forced disappearances, arbitrary detention, and torture.[13]

21. The country has also experienced dramatic economic decline: during Defendant Maduro's nearly thirteen-year tenure as President of Venezuela, the attendant shortages in both

---

[9] *See generally* UNHRC, A/HRC/45/CRP.11.

[10] *Id.* at ¶¶ 1972-74; *see also* U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., Venezuela Human Rights Reports dated 2016-2023 (consistently reporting Venezuela's inability to hear cases involving human rights violations).

[11] Inter-Am. Comm'n Hum. Rts., *Venezuela: Serious human rights violation in connection with the elections*, OEA/Ser.L/V/II, doc. 253/24 (Dec. 27, 2024), https://www.oas.org/en/iachr/reports/ pdfs/2025/report-venezuela-serioushhrr-violations-connections-elections.pdf.

[12] The Carter Center, *Centre Finds Democracy Thwarted in Venezuela* (Feb. 18, 2025), https://www.cartercenter.org/stories/center-finds-democracy-thwarted-in-venezuela/.

[13] Hum. Rts. Watch, *Punished for Seeking Change: Killings, Enforced Disappearances and Arbitrary Detention Following Venezuela's 2024 Election* (Apr. 30, 2025), https://www.hrw.org/report/2025/04/30/punished-seeking-change/killings-enforced-disappearances-and-arbitrary-detention.

food and medical supplies during his reign had a devastating effect on the population.[14] As a result, the vast majority of people still in the country are severely impoverished, and over 7.9 million Venezuelans—23% of the population—have fled their home country since 2014.[15]

22.     While Venezuelans remain in poverty, institutions to safeguard civilians' rights have not improved as the country experiences political upheaval following the capture and detention of Defendant Maduro by the United States.

### Precursor to FAES: the Establishment of the Operation to Liberate and Protect the People (OLP)

23.     The precursor to FAES—the security force responsible for the extrajudicial execution of the Plaintiffs' family members and the torture of several Plaintiffs—was a series of militarized operations called the Operation to Liberate and Protect the People (*Operación de Liberación y Protección del Pueblo*, or "OLP").

24.     Defendant Maduro launched the OLP in 2015 with the purported goal of combating violence and organized crime. Venezuelan security forces were highly involved in carrying out the OLP. The security forces included: the Bolivarian National Guard; the Bolivarian National Police; the Bolivarian National Intelligence Service; the Scientific, Penal, and Criminal Investigative Police; local police forces; and sometimes other members of the National Bolivarian Armed Forces.

---

[14] ORG. OF AM. STATES, REPORT OF THE GENERAL SECRETARIAT OF THE ORGANIZATION OF AMERICAN STATES AND THE PANEL OF INDEPENDENT INTERNATIONAL EXPERTS ON THE POSSIBLE COMMISSION OF CRIMES AGAINST HUMANITY IN VENEZUELA 6 (2021), https://www.oas.org/documents/eng/press/Informe-Panel-Independiente-Venezuela-EN.pdf.

[15] United Nations High Comm'r for Refugees, *Venezuela Humanitarian Crisis*, https://www.unrefugees.org/emergencies/venezuela/.

25. The first operation under the OLP took place on July 13, 2015. Venezuelan security forces targeted a poor and impoverished community in Caracas, Cota 905, in a raid that killed over a dozen people and resulted in the arrest of over 100 individuals.[16]

26. Following this initial raid, militarized operations, under the guise of the OLP, expanded to numerous low-income communities. Those communities were subjected to raids in which heavily armed and unidentified security officers broke down doors and forcibly entered homes.

27. Security agents would then beat or violently abuse their victims before killing them. These agents would then steal food and other necessities, like cell phones, tablets, diapers, clothes, and shoes from their victims.

28. These attacks occurred almost exclusively in low-income areas against young, impoverished men. Even prior to the launch of the OLP in 2015, the young men and their families living in these low-income areas faced serious discrimination due to class and racial prejudices shared by a wide sector of the Venezuelan population.

29. The government capitalized on these prejudices. By branding the victims as criminals, regardless of any evidence to support those allegations, Maduro's administration used this prejudice and discrimination to craft a narrative that there was an "internal enemy" that needed to be vanquished in Venezuela, thereby legitimizing the mass extrajudicial killings. The killings, alongside the false narratives that the victims were criminals and/or had "resisted

---

[16] OFFICE OF THE UNITED HIGH COMM'R FOR HUM. RTS., HUMAN RIGHTS VIOLATIONS IN THE BOLIVARIAN REPUBLIC OF VENEZUELA: A DOWNWARD SPIRAL WITH NO END IN SIGHT 16 (2018), https://www.ohchr.org/sites/default/files/Documents/Countries/VE/VenezuelaReport2018_EN.pdf.

authority," also allowed Maduro to legitimize the OLP and provide statistics that purportedly demonstrated that he and his administration had reduced crime in Venezuela.[17]

**Establishment of FAES**

30.     Defendant Maduro abandoned the OLP in 2017, as local and international organizations decried the policy as facilitating human rights abuses. He swiftly replaced it with FAES, an elite branch of the Bolivarian National Police (*Policía Nacional Bolivariana*, or "PNB").

31.     In a public announcement on July 14, 2017, Defendant Maduro, wearing a police uniform, unilaterally announced the establishment of FAES and stated that the group would be trained to defend and protect civilians against crime. Below is a photo of that announcement that was posted on YouTube:[18]



---

[17] *Id.* at 17 ("Victims' accounts raise questions as to whether OLPs were really meant to dismember criminal groups, stop crime and bring alleged criminals to justice. A number of elements seem to indicate they were an instrument for the Government to showcase alleged results in crime reduction.").

[18] *Maduro en la graduación en la UNES de la Policía Nacional Bolivariana, 14 julio 2017*, YouTube, at 1:32:27, https://www.youtube.com/watch?v=JQ43MSRCeUA (Maduro in police uniform announcing activation of FAES).

In the announcement, Maduro also stated that targets of FAES were supposed to be terrorists and foreign threats to the stability of the Venezuelan government.

32. Defendant Maduro created FAES by fiat, and not through any legitimate legislative governmental process. Nothing besides Defendant's personal announcement—like any other official, public documents—exist in the public record on the creation of FAES.

33. Maduro equipped FAES with weapons and specialized military equipment. The security force quickly increased in size, doubling from 641 officers to over 1,200 officers in a single year.

34. Between 2017 and 2020, FAES was responsible for at least 1,300 deaths. The actual amount is believed to be higher. For instance, it is estimated that, in 2018, FAES was responsible for up to 1,700 deaths.[19] The high number of murders was motivated, in part, by the government's establishment of a "lethal indicator" that was used publicly to demonstrate the effectiveness of the special police operations. The language to describe these murders was "death by resistance to authority" ("*muerte por resistencia a la autoridad*"). The body count dynamic trickled down to FAES, where death quotas and incentives were reported in various units to heighten the kill rates.

35. Despite public statements to the contrary, FAES continued targeting the same victims as the OLP: mostly young, low-income men, ranging in age from 15 to 35 years old.

36. As FAES began operating in 2017 and grew, its missions typically followed a consistent pattern which is set forth below.[20]

---

[19] Keymer Ávila, *¿Cómo se organiza la violencia desde el Estado en Venezuela?*, EL DIARIO (June 19, 2020), https://eldiario.com/2020/06/19/como-se-organiza-la-violencia-desde-el-estado-en-venezuela/.

[20] *See* Hum. Rts. Council, *Report of the independent international fact-finding mission on the Bolivarian Republic of Venezuela*, U.N. Doc. A/HRC/45/33 ¶¶ 102-119 (Sept. 25, 2020), https://docs.un.org/en/A/HRC/45/33 (documenting the pattern of FAES abuse against young, low-income men).

37.     First, FAES officers would arrive in a designated, impoverished neighborhood in black vehicles with no license plates. The officers would be armed and dressed in all black clothing, with no identification and balaclavas covering their faces.

38.     Next, FAES officers would forcibly and illegally enter homes in low-income neighborhoods, usually under the darkness of night or the early morning. Contrary to Venezuelan law, the officers would typically not have a warrant or any other legal basis to justify the forcible entry into someone's home.

39.     FAES officers would then forcibly remove family members and other members of the household, leaving only the targeted victims in the home. Once alone, FAES officers then executed the victims. Sometimes other household members were beaten while they were forcibly segregated from the targeted victims.

40.     The specific method of execution also followed a familiar pattern. FAES typically forced the victims to their knees, hands behind their heads, and then shot them at point-blank range. Sometimes the FAES would also beat their victims before executing them.

41.     FAES officers would then typically ransack the victim's home, destroy belongings, and steal personal effects, money, and even the victim or the victim's family's vehicles. If the victim was killed on the street, FAES would often strip them of their personal belongings to prevent identification of the victim and hide evidence concerning their crimes.

42.     In addition to murdering individuals in their homes, executions frequently occurred on public roads in and around low-income areas, in full view of others and without any fear of accountability. These public displays of violence achieved Maduro's political purposes by demonstrating results from operations purportedly taken to prevent crime and protect the public while also quelling dissent and political opposition.

43. Following the executions, FAES would tamper with the crime scene, either on their own or in concert with the police unit responsible for investigation, which was typically the Scientific, Penal, and Criminal Investigative Police (*Cuerpo de Investigaciones Científicas, Penales y Criminalísticas*, or "CICPC"). The goal of this tampering was to make it appear as though the victim had resisted, justifying the FAES's use of lethal force. For example, FAES officers would shoot at walls and into the air to simulate an armed confrontation. They would also plant weapons in victims' homes or near their person to suggest that the individual had been armed and resisting.

44. Routinely, the men and boys FAES shot would be transported to a hospital. The victims were usually deceased on arrival, although some died later from their wounds. In multiple instances, FAES prevented medical personnel from offering any medical aid to the victims. Family members were also prohibited from seeing the dead bodies of their relatives to prevent them from ascertaining the true cause of death.

45. Finally, at the conclusion of FAES operations, criminal records for the executed victims would be fabricated, and the victims' killings would be logged as "resistance to authority." These were institutionalized steps taken to systematically justify killings when, in fact, they were murders.

46. Most commonly, FAES would terrorize an entire neighborhood; many executions would occur in a single day or over the course of multiple days. With the knowledge, approval, and direct support of Maduro, FAES justified these raids as necessary to fight crime.[21]

---

[21] *Id.* at ¶ 160 (noting that, with regard to State violence in general, "[t]he mission has reasonable grounds to believe that most of the violations and crimes documented in the present report were committed as part of a widespread and systematic attack directed against a civilian population, with knowledge of the attack, pursuant to or in furtherance of two distinct State policies. First, there was a policy to silence, discourage and quash opposition to the Government

47.     In such instances, FAES's conduct was not a targeted, legally-sanctioned operation to locate individuals based on actual evidence of suspected wrongdoing. Rather, FAES's claim of fighting organized crime was a pretext to terrorize and kill any person who fell within the group of young men or boys they encountered in specific, impoverished neighborhoods or areas—even those for whom there was no evidence of criminal involvement. Moreover, as noted, these raids and the invasion of people's homes were often conducted illegally, *i.e.*, without a warrant or any judicial authorization, further casting doubt on the legitimacy of any individual raid.

48.     On other occasions, FAES would individually target young, impoverished men, with the intention of stealing their money and other belongings.

49.     Despite consistent and repeated public reporting from the international community expressing serious concern about the human rights violations perpetrated by the security force, FAES has not been held accountable for its serial, unjustifiable torture and extrajudicial murders. While Maduro's administration reportedly initiated investigations into FAES actions, the investigations have not been transparent and, if known, were largely for show. In fact, the Maduro administration's attempts at securing accountability for FAES actions are better understood as attempts to placate the international community.

50.     As an example, in 2018, the United Nations High Commissioner for Human Rights expressly called for FAES's dissolution and called for an investigation of FAES's extrajudicial executions.[22] While the Venezuelan Government purportedly complied with the High

---

of President Maduro, including by targeting individuals who, through various means, demonstrated their disagreement with the Government, or who were perceived as being against the Government. In addition, their relatives and friends were targeted for being associated with them. *Second, there was a policy to combat crime, including by eliminating individuals perceived as 'criminals' through extrajudicial execution*.") (emphasis added).

[22] OHCHR, A/HRC/41/18, ¶ 81(i) ("OHCHR calls upon the Government of the Bolivarian Republic of Venezuela to immediately: . . . Dissolve the Special Action Forces of the

Commissioner's call to dissolve FAES in 2022,[23] the Independent Fact Finding Mission for Venezuela alleged that the unit had merely changed its name and continued to operate,[24] suggesting that there has been no real effort on the part of the Venezuelan government to combat impunity for FAES.

51.     Moreover, Venezuelan investigations into FAES have focused exclusively on low-level officers. Even then, those investigations have been delayed and have resulted in few instances in which one or a few low-level officers were arrested; only a handful of low-level perpetrators have been convicted.[25] Verdicts or penalties have also been overturned without explanation.

---

Bolivarian National Police and establish an impartial and independent national mechanism, with the support of the international community, to investigate extrajudicial executions during security operations, ensure accountability of perpetrators and redress for victims.").

[23] Off. of the High Comm'r for Hum. Rts., *Situation of human rights in the Bolivarian Republic of Venezuela*, U.N. Doc A/HRC/50/59 ¶ 11 (June 23, 2022), https://docs.un.org/en/A/HRC/50/59 ("The restructuring of the Bolivarian National Police (BNP), initiated in April 2021, continued throughout the reporting period. OHCHR provided technical assistance to the process. The Special Action Forces of the Bolivarian National Police (FAES), which was involved in deaths in the context of security operations, have officially been dissolved. 13 cases documented by OHCHR are under investigation, four in trial and three former members of FAES were convicted.").

[24] HRC, A/HRC/54/57, ¶ 84 ("The mission has reasonable grounds to believe that, despite the apparent dissolution in 2022 of the Special Action Forces, there is continuity between it and the Directorate of Strategic and Tactical Action, created in July 2022. Both institutions have similar functions and use the same modus operandi. Moreover, many Special Action Forces officials, some of whom were identified as having been involved in gross human rights violations and even crimes against humanity, now hold key roles within the chain of command of the Directorate."); Hum. Rts. Watch, *Venezuela: Events of 2023*, https://www.hrw.org/ world-report/2024/country-chapters/venezuela.

[25] OHCHR, A/HRC/41/18, ¶ 53 (reporting five FAES members had been convicted of attempted murder, misuse of a weapon, and simulation of a punishable act for actions taken in 2018, while 388 members were under investigation for murder, cruel treatment, and illegal house raids committed between 2017 and 2019); Office of the High Commissioner for Human Rights, *Outcomes of the investigation into allegations of possible violations of the human rights to life, liberty, and physical and moral integrity in the Bolivarian Republic of Venezuela*, U.N. Doc. A/HRC/44/20 ¶ 38 (Sept. 17, 2020), https://docs.un.org/en/A/HRC/44/20 (reporting that,

52.     Crucially, prosecutors in Venezuela have not pursued cases against higher-level officials who ordered or authorized the raids because the murder, violence, and theft were committed by an organization that then-President Maduro had created, authorized, empowered, and knowingly failed to prevent or punish.

**Defendant Maduro's Command and Control over FAES**

53.     FAES was a clear extension of Defendant Maduro's policy and practice to use violence and instill fear as a cornerstone of his government's actions. Maduro explicitly created and backed FAES as an elite unit of the Bolivarian National Police, and it operated largely by verbal command. Commanders protected lower-level FAES agents, even as they routinely used extrajudicial killings to increase their "kill count." Defendant Maduro was at the top of that command-and-control structure.

54.     Venezuelan law formally vests the President of the Republic with the ultimate power and control over all security and military functions. Part of the President's responsibility, as established by the Constitution of Venezuela in Article 332, is to maintain public order, protect citizens, and ensure the peaceful enjoyment of constitutional guarantees and rights.[26] To effectuate this responsibility, the President is required to organize a uniformed national police

---

between 2017 and 2020, the Venezuelan Attorney General initiated 4,890 investigations into killings during all security operations, including those conducted by FAES. By March 2020, 4,861 of the investigations were in a preliminary phase; 15 in an intermediate phase; 13 in the trial phase; and one individual had been convicted for homicide.); United Nations Human Rights Council, *Situation of human rights in the Bolivarian Republic of Venezuela* ¶ 8, U.N. Doc. A/HRC/47/55 (June 16, 2021), https://docs.un.org/en/A/HRC/47/55 [hereinafter UNHRC, A/HRC/47/55] (reporting no arrests following one of the largest raids on an impoverished neighborhood that resulted in the deaths of at least 14 young men).

[26] CONSTITUCIÓN DE LA REPUBLICA BOLIVARIANA DE VENEZUELA [CONSTITUTION OF THE BOLIVARIAN REPUBLIC OF VENEZUELA], art. 332 (1999) ("The National Executive, in order to maintain and restore public order, protect citizens, homes, and families, support the decisions of the competent authorities, and ensure the peaceful enjoyment of constitutional rights and guarantees, in accordance with the law, shall organize . . . A uniformed national police force[.]").

force; FAES falls under this responsibility as an elite branch of the Bolivarian National Police. The constitution explicitly details that security agencies under Article 332 are "civilian in nature and shall respect dignity and human rights, without any discrimination."[27]

55.　Furthermore, the Law on the Statute of Police Function in Articles 17,[28] 35,[29] and 37[30] mandate that the President of Venezuela serves as the leader of the Police Service, which includes FAES, and is responsible for establishing the hierarchy and qualifications necessary for police and security forces.

56.　The Regulations of the Law on the Statute of Police Function Regarding Personnel Administration and Development of the Police Career, at Article 5,[31] establishes that, in the hierarchy of the police forces in Venezuela, the President occupies the first position—akin to Commander-in-Chief in the United States.

---

[27] *Id.* ("The citizen security agencies are civilian in nature and shall respect dignity and human rights, without any discrimination.").

[28] LEY DEL ESTATUTO DE LA FUNCIÓN POLICIAL [LAW ON THE STATUTE OF POLICE FUNCTION], art. 17 (2009, amended in 2021) ("The President of the Republic exercises authority over the Police Function, as well as its direction within the National Executive Branch.").

[29] *Id.*, art. 35 ("The hierarchical organization and police ranks, as well as the competencies and skills required for each hierarchical level, will be established by regulation by the President of the Bolivarian Republic of Venezuela.").

[30] *Id.*, art. 37 ("The basic requirements for placement and promotion in the police hierarchy will be established by regulation by the President of the Bolivarian Republic of Venezuela.").

[31] REGLAMENTO DEL DECRETO CON RANGO, VALOR Y FUERZA DE LEY DEL ESTATUTO DE LA FUNCIÓN POLICIAL EN MATERIA DE ADMINISTRACIÓN DE PERSONAL Y DESARROLLO DE LA CARRERA POLICIAL [REGULATIONS OF THE LAW ON THE STATUTE OF THE POLICE FUNCTION REGARDING PERSONNEL ADMINISTRATION AND DEVELOPMENT OF THE POLICE CAREER], art. 5 (2009, amended in 2017) ("The hierarchical organization and distribution of responsibilities in the personnel administration system of the police function, for the proper development of the police service in the different political-territorial areas, comprises the following levels: 1. Rectorate Level: The President of the Republic.").

57.     After the President, the next level of authorities includes the Minister of the Interior and Justice—Néstor Reverol served in this position from 2016 until 2020; Carmen Meléndez assumed the post from 2020 until 2021. After the Minister of Interior and Justice, is the Vice Minister of the Integrated Police System. Edylberto José Molina served in this role from 2016 until 2020 and was succeeded by José Gregorio Rojas Eugenio, who was Vice Minister until 2023. After these individuals, FAES is overseen by specific directors: the General Director of the Bolivarian National Police during the relevant timeframe was Carlos Alfredo Pérez Ampueda (2017-2019) and then Elio Ramón Estrada Paredes (2019-2023); the Sub-Director of the Bolivarian National Police was José Valentín Hernández Rojas (2017-2019) and then Rubén Darío Santiago Servigna (2019-2023); and the Director of FAES was Rafael Enrique Bastardo Mendoza (2017-2019) and then José Miguel Domínguez Ramírez (2019-2022).

58.     In addition to these entities comprising FAES hierarchy, the Vice Presidents of the Republic of Venezuela during the pertinent time frame were Tareck El Aissami (2017-2018) and Delcy Rodríguez (2018-2026). The Director of the CICPC—the intelligence agency that frequently worked with FAES to cover up extrajudicial executions—was Douglas Arnoldo Rico González.

59.     Ultimately, these entities and directors all report to the President, who is the highest level of authority and command over police forces. As noted, during the entire relevant period, Defendant Maduro was President and thus had ultimate authority over each of the authority figures beneath him and FAES as a security force itself.

60.     While he was President, Defendant Maduro expressed overt and public approval of FAES. For example, in 2019, after the United Nations High Commissioner for Human Rights

reported extensive human rights violations committed by FAES,[32] Defendant Maduro publicly responded by chanting "Long live the FAES!" and expressing his full support for FAES's "daily work to provide security to the people of Venezuela."[33]

61. Defendant Maduro followed these remarks by acknowledging that nongovernmental organizations and other countries—including the United States—had decried FAES. Rather than address the gross human rights violations that concerned nongovernmental organizations, international organizations, and other nations, Defendant Maduro responded that he would instead "strengthen . . . expand . . . and professionalize" FAES.[34]

62. Defendant Maduro additionally began to propagandize FAES: promotional videos showing FAES officers distributing food and interacting with the elderly and children were disseminated via social media, including Facebook and WhatsApp. This propaganda campaign suggested that FAES was functioning as a social service organization, rather than a police force.

63. Official digital communications also conveyed Defendant Maduro's approval of FAES. For example, below is a post on Twitter ("X") showing Defendant Maduro posing with children wearing FAES gear in 2019:[35]

---

[32] *See* United Nations Hum. Rts. Council, *Human rights in the Bolivarian Republic of Venezuela*, U.N. Doc A/HRC/41/18, ¶¶ 47-59 (Oct. 1, 2019), https://docs.un.org/en/A/HRC/41/18.

[33] Hum. Rts. Watch, *Venezuela: Extrajudicial Killings in Poor Areas: Pattern of Serious Police Abuse Goes Unpunished* (Sept. 18, 2019), https://www.hrw.org/news/2019/09/18/ Venezuela-extrajudicial-killings-poor-areas.

[34] Maduro, Nicolás. *Campaña de descrédito contra las FAES y PNB persigue la destrucción del Estado*. PRENSA PRESIDENCIAL – MINISTERIO DEL PODER POPULAR PARA LA COMUNICACIÓN Y LA INFORMACIÓN (July 17, 2019), archived at https://web.archive.org/web/20191221152923/http:/www.minci.gob.ve/campana-de-descredito-contra-las-faes-y-pnb-persigue-la-destruccion-del-estado/.

[35] PresidencialVen (@PresidencialVen), *Maduro with children in FAES gear*, X (Dec. 20, 2019), https://x.com/PresidencialVen/status/1208122637551095811.



← **Post**

Prensa Presidencial ✔
@PresidencialVen

⊘ Show translation
#EnVivo 📻 | "Que Dios bendiga a todos los niños y niñas de Venezuela, por ellos hacemos todos, por ellos luchamos para que la Patria sea siempre libre", destacó el presidente @NicolasMaduro

12:30 PM · Dec 20, 2019

💬 4          ↻ 87          ♡ 93

64.     Defendant Maduro's command and control over FAES was absolute: he personally created FAES; served at the top of its command structure with the ability to give orders; organized the internal hierarchy of FAES officers; effectively prevented any punishment for FAES's known human rights abuses; and knowingly and publicly endorsed FAES after significant international outcry and public accusations of its involvement in facilitating human rights violations, including extrajudicial killing and torture. For example, in a presidential press release dated December 20, 2019, Maduro emphasized that security forces are essential to guaranteeing peace and public safety, reiterated the Executive Branch's support for the protection efforts carried out by FAES,

21

and ordered its expansion and strengthening.[36] A photo of Maduro was included in that presidential press release:



**Extrajudicial Killing of Plaintiffs' Family and Torture of Plaintiffs**

*Plaintiff Jane Doe 1*

65. Plaintiff Jane Doe 1 lived together with her son, deceased John Doe 1, in a parish in the Libertador Municipality in Caracas, Venezuela. In December 2017, less than six months after FAES had been created, FAES officers carried out the execution of John Doe 1.

---

[36] *Campaña de descrédito contra las FAES y PNB persigue la destrucción del Estado* ["The smear campaign against the FAES and PNB aims to destroy the State"], Ministerio del Poder Popular para la Comunicación e Información (Dec. 21, 2019), archived at https://web.archive.org/web/20191221152923/http://www.minci.gob.ve/campana-de-descredito-contra-las-faes-y-pnb-persigue-la-destruccion-del-estado/.

66. John Doe 1's execution was one of many committed by the newly-created FAES. In the six months between its creation and the execution of John Doe 1, FAES had already committed 144 executions—an average of one murder per day.[37]

67. John Doe 1's extrajudicial killing is an example of FAES's deliberate targeting of young men from impoverished communities. At least 31 of these extrajudicial killings occurred in the neighborhoods in and around Plaintiff Jane Doe 1's home in 2017.[38]

68. Early in the morning in December 2017, FAES arrived at Plaintiff Jane Doe 1's and John Doe 1's home early as part of an "operation." John Doe 1 was targeted as a young man in his early 20s living in that neighborhood, under the pretense that he participated in gang activity.

69. FAES did not have a warrant to enter the home; Plaintiff Jane Doe 1 ultimately felt forced to grant them entry into the home because FAES was threatening to break down her door. The officers demanded that John Doe 1 accompany them to a police station to sign paperwork. FAES agents then separated Plaintiff Jane Doe 1 from her son by forcing her outside, while other agents remained inside the house with John Doe 1.

70. Shortly thereafter, Plaintiff Jane Doe 1 was escorted to another location. The officers had told her that she would sign an official letter that indicated FAES officers did not find anything illegal in her apartment and that certified that the officers did not take anything

---

[37] By the end of 2017, official sources reported 4,998 deaths involving the intervention of security forces like FAES. 1,516 of these deaths are reported to be extrajudicial killings. *See* Keymer Ávila, *Construction of indicators on the use of lethal force in Venezuela*, 24 UTOPÍA Y PRAXIS LATINOAMERICANA 68, 73 (2019), https://doi.org/10.5281/ZENODO.3344852; Rebeca Hanson, *The Expansion of Police Violence and Impunity in Venezuela*, 55 LASA FORUM 34, 35 (2024) ("Only a year into their inception the FAES were implicated in numerous massacres").

[38] Monitor de Víctimas, *FAES, el grupo de exterminio de la PNB*, https://monitordevictimas.com/ejecucion-2/faes-el-grupo-de-exterminio-de-la-pnb/.

belonging to her. Believing her son would be similarly escorted to the same location, Jane Doe 1 agreed to sign the statement.

71. Plaintiff Jane Doe 1's son never arrived to where she was taken. When she left to go back to her home and find her son, she was greeted by several FAES officers, who barred her from entering. She left the area to go to the prosecutor's office to explain what was happening at her home but was told they could not interrupt the FAES operation, and all she could do was initiate a complaint.

72. Realizing the prosecutor's office was not going to assist her, Plaintiff Jane Doe 1 returned to her home, where FAES officers continued to prevent her entry. At this point, Jane Doe 1 feared for her son's life. She later learned that her son had been shot in the chest and transported to the morgue.

73. After she learned of her son's murder, neighbors informed Plaintiff Jane Doe 1 that they heard one FAES officer say to another, "The dog is dead, the rabies ends," outside of her house after her son was murdered.

74. Despite killing her son, FAES officers remained on the scene for several hours afterward; they engaged in random gunfire in an attempt to substantiate the fictitious narrative that the execution was the result of a confrontation or resistance during a FAES operation.

75. Like other relatives of youth who had been executed by FAES, Plaintiff Jane Doe 1 attempted to seek justice for the killing of her son. However, Venezuela's lack of judicial independence rendered these efforts futile. Although the prosecutorial authorities initiated an investigation, indicted, and issued orders for the arrest of some FAES officers involved in the killing, nobody has been brought to justice. Upon information and belief, these indictments were not genuine attempts to hold anyone accountable.

76. Plaintiff Jane Doe 1 has been left devastated and without meaningful recourse for her son's execution. She lives under the persistent threat of violence to herself and her family and friends should she continue to seek accountability in Venezuela, and her ongoing personal security is of critical concern while she remains in Venezuela.

*Plaintiff Jane Doe 2*

77. Plaintiff Jane Doe 2's son, deceased John Doe 2, was executed by FAES agents in September 2018 when he was in his mid-20s. He was executed near his home in one of the most populous shantytowns of Petare, a conglomeration of impoverished neighborhoods in the metropolitan area of eastern Caracas.

78. John Doe 2's execution was one of 90 documented executions that occurred in the area during 2018.

79. John Doe 2's extrajudicial killing followed FAES's systematic practice described above. FAES officers were conducting an "operation" in his neighborhood early in the morning. Over a dozen officers stopped John Doe 2 as he was walking toward his home after visiting friends the night before. According to a neighbor who witnessed the interaction, the FAES officers, without asking him for any identification, told John Doe 2 that he was the "thug" they were looking for.

80. FAES officers proceeded to detain John Doe 2, throw him to the ground, and beat him. They broke his nose and destroyed his teeth, leaving his face disfigured. Neighbors heard John Doe 2 begging the officers to not kill him because he had young children. When John Doe 2 attempted to pull free from their brutality, the officers shot him in the chest at close range.

81. After shooting John Doe 2, officers transported him to the hospital. He was still alive upon arrival. However, the officers ordered hospital staff to deprive John Doe 2 of

medical assistance because he was—according to them—a criminal. This practice of preventing treatment for individuals shot by FAES has been documented in other cases and denounced by health workers.

82.     John Doe 2 died shortly thereafter. His death certificate indicated that he died of hypovolemic shock, having choked on his own blood. FAES officers, in an effort to delay or prevent his postmortem identification, stripped him of any identifying articles, including clothing and his ID card, before he was transported to the hospital's morgue.

83.     Shortly after killing John Doe 2, the FAES officers were still in the area. Neighbors overheard the unit receive a radio call in which a central police information center informed FAES that John Doe 2 had no criminal record. FAES then commenced their coverup, altering the scene to make it appear like John Doe 2 engaged in a confrontation with FAES. They even planted a weapon. These efforts were part of FAES's procedure for covering up the extrajudicial killing of John Doe 2 by substantiating the false allegation that the killing was justified due to the victims' armed resistance.

84.     John Doe 2's family members were told that John Doe 2 had been detained and then shot because he was allegedly armed with a gun.

85.     Plaintiff Jane Doe 2's attempts to seek justice for John Doe 2's extrajudicial killing have been futile. The prosecutor's office and other investigators from the CICPC have refused to answer Jane Doe 2's questions or provide her updates on any investigation into John Doe 2's killing. They also told Jane Doe 2 that they were operating under orders to not investigate FAES cases. Jane Doe 2, like the relatives of other individuals killed in her neighborhood, has continued to live in fear of reprisal because she reported her son's execution. Her ongoing personal security is of critical concern, as she still lives in Venezuela.

*Plaintiff Jane Doe 3*

86.     FAES officers executed Plaintiff Jane Doe 3's son, deceased John Doe 3, when they illegally raided his home in June 2019. John Doe 3's home was in Las Minas de Baruta, an impoverished neighborhood within metropolitan Caracas. John Doe 3 conducted repairs and sales of used vehicles; relative to others in the neighborhood, he had more means and was believed to have more cash on hand.

87.     Around 4:00 a.m., more than ten FAES officers dressed in black with masked faces, entered John Doe 3's neighborhood.

88.     John Doe 3 was asleep when the officers began attempting to break into his home. Because he had nothing to hide and no criminal affiliation, John Doe 3 asked them to stop and told them he would let them in. After John Doe 3 opened the door, he was detained and handcuffed to a nearby gate. The officers stole the keys to his apartment.

89.     Half of the FAES officers present stormed into his home. They stole two suitcases of clothing, ripped into his mattress looking for money, and stole other personal items like perfume, deodorant, and videos, a motorcycle, and a car. They also planted a weapon in the home.

90.     The remaining FAES officers stayed outside with John Doe 3. They began to torture him, asking where "the money" was. They beat John Doe 3 repeatedly while he screamed that they were killing him. Surrounding neighbors heard John Doe 3's pleas for his life. FAES then shot John Doe 3 twice at close range; he was executed just thirty minutes after FAES arrived at his apartment. He was in his early 30s.

91.     FAES facilitated the transportation of John Doe 3's body to the hospital, where medical records confirmed that he arrived without vital signs.

92.     Plaintiff Jane Doe 3 heard from one of her son's neighbors that FAES was in John Doe 3's home. She left immediately, understanding the threat FAES presented. Jane Doe 3 arrived at the scene around 6:00 a.m.

93.     FAES was still there when Plaintiff Jane Doe 3 arrived. They blocked her from entering her son's home.

94.     FAES officers refused to let Plaintiff Jane Doe 3 enter the building for hours. They told her she was detained, refused to provide her information about her son who had already been killed, and physically pushed her to forcibly keep her out of the building.

95.     Plaintiff Jane Doe 3 asked what John Doe 3 had done. FAES would not answer her questions.

96.      Plaintiff Jane Doe 3's other son and a niece had joined her at the scene. FAES officers informed them that John Doe 3 had been wounded, and that they should look for him in the local hospitals.

97.     While her son and niece departed for the hospital, Plaintiff Jane Doe 3 remained at the scene, unable to do anything as she watched FAES raid his apartment, stealing everything from his clothing to his young daughter's toys.

98.     Between 9:00 a.m. and 10:00 a.m., Plaintiff Jane Doe 3 received a call from her niece, who told her John Doe 3 was dead and had been found at the morgue. After hearing her son had been killed, Jane Doe 3 tried to run away from the scene but became so distraught that she fainted and required medical attention. She was transported to the hospital by a relative.

99.     Around 10:00 a.m., neighbors heard FAES officers begin shooting at John Doe 3's building and into the air to cover up the execution of John Doe 3 by simulating a confrontation that was further corroborated with the weapon they had planted at the scene.

100. Plaintiff Jane Doe 3 recalls waking around 1:00 p.m. that day. She lost her memory between hearing the news of her son's murder and waking in the hospital. She was profoundly traumatized, and she felt that she had lost her mind. Knowing that her son was dead and had been murdered in cold blood by FAES made her want to die.

101. Plaintiff Jane Doe 3's life was gravely affected by FAES's murder of her son. She continued to experience physical repercussions after his death. She did not sleep for several days. At her son's funeral, Plaintiff Jane Doe 3 could not process that he was dead, described wanting to throw herself into the coffin, too, and ultimately required a second hospitalization after her son's funeral. After hours in the hospital, Plaintiff Jane Doe 3 was transported back to her home, where she cried and prayed that everything that had happened had just been a bad dream. Immersed in a state of shock and deep depression, Plaintiff Jane Doe 3 did not leave the house for the following six months.

102. In the days following John Doe 3's extrajudicial killing, other young men were executed under similar circumstances. In fact, the neighborhood was so terrorized by FAES that John Doe 3, prior to his execution, had planned to flee the country. FAES killed him days before he was set to leave with his daughter.

103. When Plaintiff Jane Doe 3 was finally able to leave her home following her son's murder, she sought justice for her son's execution, with no success. She visited the prosecutor's office every week for three years. Her case was passed around between five prosecutors; no one elected to pursue her case. While no investigation was conducted into the murder, false incrimination, and robbery of Jane Doe 3's son, she instead faced months of being harassed by intelligence agents asking suspicious questions about documents associated with the motorcycle and car stolen by the FAES officers. Ultimately, Plaintiff Jane Doe 3 fled the country.

104. Plaintiff John Doe 4 is the father of deceased John Doe 5, whom FAES executed in September 2020 when he was in his mid-20s.

105. In the middle of the night, around 3:00 a.m., two FAES officials forcibly entered John Doe 5's home, which was in an impoverished area within the Barranca parish in the state of Mongas, Venezuela. John Doe 5 was asleep, and his wife, child, and brother-in-law were in the home with him.

106. FAES officers separated the men from the rest of the family. They forced John Doe 5 and his brother-in-law to their knees and led John Doe 5's wife and child outside.

107. While John Doe 5 and his brother-in-law were still on their knees with their hands behind their backs, FAES officers shot at them at point blank range. John Doe 5 was struck twice; his brother-in-law was struck three times. They both died at the scene.

108. Despite being deceased, John Doe 5 and his brother-in-law were transported to the hospital by FAES officers and under armed guard. Plaintiff John Doe 4 arrived at the hospital and witnessed his son's dead body.

109. FAES officers covered up John Doe 5's killing. They shot their weapons at the walls of John Doe 5's home and into the air to simulate a confrontation and planted weapons in the home. They also stole $300 in cash as well as personal items including gold, shoes, clothes, perfumes, and food.

110. The FAES officers not only terrorized John Doe 5's family that night, but they also robbed other individuals in the neighborhood before they departed.

111. Several days later, FAES returned to the neighborhood, responding to public outrage at FAES's repeated terrorization of their community. The officers threatened the

neighborhood and detained and abducted several dozen individuals. Their actions demonstrated a persistent targeting and abuse of individuals living in this impoverished neighborhood.

112. Following John Doe 5's execution, Plaintiff John Doe 4 continued to fear for his family's safety. For example, FAES threatened and intimidated John Doe 4's other son. Local prosecutors ignored John Doe 4's attempts to report the execution of John Doe 5 and provide information about the circumstances surrounding the FAES officers' attack. The threats and intimidation against John Doe 4's second son were so severe that he was forced to flee the country. Plaintiff John Doe 4 now remains in Venezuela, and safety remains a primary concern.

*Plaintiff Jane Doe 4*

113. Plaintiff Jane Doe 4 is the sister of deceased John Doe 6 and deceased John Doe 7. In January 2021, during a massive FAES operation in their parish that was later deemed a massacre,[39] Jane Doe 4 was brutally beaten and forced to witness the summary execution of both of her brothers. When they were executed, John Doe 6 was in his early 20s and John Doe 7 was a teenager.

114. Plaintiff Jane Doe 4, her brothers, and a younger sister lived in an impoverished neighborhood in the western portion of Caracas with their mom. In or around January 2021, the neighborhood was on high alert, as a confrontation between FAES and an alleged criminal group was expected at any point due to FAES's pattern of attacking individuals in other similar communities.

---

[39] *See* UNHRC, A/HRC/47/55, ¶ 8 ("In response to the increase in gang-related violence, as many as 650 police officers from various units of the Bolivarian National Police, including the Special Action Forces [FAES] and the Directorate of Criminal Investigations, were deployed to La Vega parish in Caracas between 6 and 9 January 2021. It is known to have been the largest security operation conducted during the reporting period. In the course of the operation, at least 14 young men were reportedly killed by police force members, including at least 2 teenage boys").

115. Because they feared being arbitrarily detained by FAES, Plaintiff Jane Doe 4 and her siblings took precautions to ensure that they always carried documents proving that they were students. The brothers—John Does 6 and 7—went to a relative's home in the same neighborhood to be safe during the expected FAES raid. Plaintiff Jane Doe 4 and her younger sister remained at their nearby home.

116. Around 11:00 a.m., on January 8, 2021, a FAES officer banged on Plaintiff Jane Doe 4's door. When Plaintiff Jane Doe 4 opened the door, two armed FAES officers faced her, one of whom pointed his weapon at her face. The gun-wielding officer, visibly agitated, forced himself inside and searched the home, while Plaintiff Jane Doe 4's little sister cried. The FAES officer eventually left.

117. Plaintiff Jane Doe 4 ran to her relative's home to check on her brothers. FAES agents intercepted her and ordered her onto the ground.

118. Upon information and belief, the FAES officers decided John Does 6 and 7 were viable targets for execution. The FAES officers assaulted Plaintiff Jane Doe 4 to force her to give them access to her relative's home. They grabbed her hair, hit her with a pistol, and then dragged her to the gate of her relative's home. They forced Jane Doe 4 to open the gate so they could get to her brothers. The officers did not permit her to leave and stole her phone.

119. Once the gate to Jane Doe 4's relative's home was opened, the FAES officers began to bang on the relative's door. When her relative's husband opened the door, he was confronted with a FAES officer pointing a gun at him. FAES forced everyone out of the home, except for John Does 6 and 7—following their standard tactic of separating other family members from the young men targeted for execution.

120. Inside, FAES officers forced John Does 6 and 7 to kneel. John Doe 6 knew that a young nephew was hiding under the bed nearby. He begged the FAES officers to let both the nephew and John Doe 7 go because they were children. The officers only let the nephew leave.

121. Meanwhile, Plaintiff Jane Doe 4 and her relatives had taken refuge in Jane Doe 4's home. However, Jane Doe 4 left her home on multiple occasions and desperately tried to reach her brothers. When she ran toward the relative's house, FAES officers standing guard brutally beat her.

122. Soon thereafter, Plaintiff Jane Doe 4 heard gunshots from the home in which FAES officers were holding John Does 6 and 7 hostage. When Jane Doe 4 tried to run to her brothers again, she was held back by her relatives.

123. Plaintiff Jane Doe 4 and her relatives continued to hide in her home. During this time, Jane Doe 4 heard more gunshots. FAES officers fired several shots, simulating a confrontation. One FAES officer caught Plaintiff Jane Doe 4's friend, who hid with them, attempting to watch what the FAES was doing to tamper with the scene; they dragged the friend from the house and beat her in front of Jane Doe 4.

124. From a hole in her home, Plaintiff Jane Doe 4 watched as they took John Doe 6's body away in a sheet. She did not see what happened with John Doe 7.

125. A FAES officer confronted Plaintiff Jane Doe 4 after their simulated confrontation ended. The officer returned her phone to her and told her that he knew that her brothers were innocent, but he had to do his job.

126. The next day, Plaintiff Jane Doe 4 went to the hospital and confirmed that John Doe 6 had been dead upon arrival, and that John Doe 7 died shortly after. They were shot at close range.

127. Plaintiff Jane Doe 4 identified both of her brothers' deceased bodies in the hospital. She also saw their injuries, noting that one had been shot in the chest, while the other was shot in his side.

128. Plaintiff Jane Doe 4's experience being physically beaten, hearing her brothers be killed, and then seeing her brothers' deceased bodies caused her significant and long-lasting psychological damage. She experienced continuous psychological trauma that was so disruptive to her life and her sense of security within Venezuela that she felt compelled to flee the country for her own safety. Jane Doe 4 still requires medication to be able to sleep at night and receives extensive trauma-focused therapy in order to begin to process the traumatic events described herein.

129. Like all the Plaintiffs and many other individuals whose families were killed and terrorized by FAES, Plaintiff Jane Doe 4 attempted to report her brothers' executions to the prosecutor's office. Her complaints were dismissed.

130. Plaintiff Jane Doe 4 continues to fear for her and her family's lives. She has fled Venezuela.

**Plaintiffs Have No Adequate Alternative Remedies**

131. There is no adequate alternative remedy available to Plaintiffs in Venezuela for the claims asserted here.

132. Venezuelans' ability to report human rights violations and crimes perpetrated by Venezuelan authorities is limited and dangerous. The international community has consistently expressed concern about Venezuela's failure to prosecute allegations of extrajudicial killings,

torture, or other human rights violations committed by security forces, and impunity for high-level commanders is the norm.[40]

133. Each Plaintiff has attempted to report the extrajudicial killing of their relatives to prosecutors' offices and has been rebuffed. Accountability is not achievable.

134. The failure to investigate and prosecute perpetrators of extrajudicial killings in Venezuela is due to the cooptation of judicial and prosecutorial powers by Defendant Maduro and his administration. Access to justice has been systematically curtailed by Defendant Maduro's administration, including by intentionally altering the composition of the Venezuelan Supreme Court to favor party loyalists, which has resulted in numerous Supreme Court decisions in favor of Defendant Maduro and his party.[41] Some of these decisions permitted the government to exercise expansive emergency powers, challenged the validity of the election of opposition party members, and even prevented the participation of opposition party members in the 2018 presidential elections.[42]

135. Moreover, judges and prosecutors who defy the regime have been subject to persecution—including by being subjected to arbitrary detention,[43] or have otherwise refrained from speaking against the party for fear of retribution or due to political pressure.[44] In fact, when

---

[40] *See* U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., Venezuela Human Rights Reports dated 2016-2023 (consistently reporting Venezuela's inability to hear cases involving human rights violations); UNHRC, A/HRC/45/CRP.11, at ¶¶ 371-372, 1265-1285, 1581-1591.

[41] UNHRC, A/HRC/45/CRP.11, ¶¶ 72-73.

[42] *Id.* at ¶¶ 74-97.

[43] *See, e.g.*, Diego García-Sayán, *Venezuela: UN expert condemns further sentence against Judge Afiuni, says clearly act of reprisal*, UNITED NATIONS OFF. OF THE HIGH COMM'R FOR HUM. RTS. (Mar. 26, 2019), https://www.ohchr.org/en/news/2019/03/venezuela-un-expert-condemns-further-sentence-against-judge-afiuni-says-clearly-act?LangID=E&NewsID=24405.

[44] UNHRC, A/HRC/45/CRP.11, ¶¶ 161-165.

the former Attorney General spoke out against Defendant Maduro's administration in 2017, including by alleging that some of the deaths committed by Venezuela security forces were executions, she was removed from the position.[45] She later was subject to political reprisal, and has since left the country.[46]

136. This impunity is further perpetuated by the fact that the FAES officers involved in the present complaint covered up their own actions by employing a strategy of simulating armed confrontations, planting weapons, and otherwise fabricating that the Plaintiffs' murdered family members were criminally affiliated or had engaged in violent resistance to a FAES operation. In many cases, fraudulent intelligence and criminal files were generated for the deceased John Does to further substantiate the narrative that they were criminally affiliated.

137. The current situation in Venezuela following Defendant Maduro's capture and detention by the United States does not provide the Plaintiffs with any further opportunity to seek or obtain local remedies. Rather, the situation in Venezuela remains highly unstable. The individuals responsible for the creation of FAES remain in power today as high-ranking officials in Venezuela, and Plaintiffs face ongoing fear that their pursuit of local remedies would result in further reprisal against them. Venezuela has not engaged in any meaningful change in the judicial and prosecutorial process such that the Plaintiffs would have a viable avenue for relief.

138. As such, any remedies that could be available in Venezuela are unobtainable, ineffective, inadequate, and futile. The present complaint is the only method by which Plaintiffs may achieve some degree of accountability and acknowledgment of the extrajudicial killing of

---

[45] *See id*. at ¶ 164.

[46] Organized Crime and Corruption Reporting Project, *Venezuela's Ex-Prosecutor: President Maduro is involved in Corruption* (Aug. 24, 2017), https://www.occrp.org/en/news/venezuelas-ex-prosecutor-president-maduro-is-involved-in-corruption.

their relatives and their personal torture at the hands of the FAES under the direction and control of Defendant Maduro.

## GENERAL ALLEGATIONS

139. Defendant Maduro was the President of Venezuela at all times relevant to the present complaint.

140. At all relevant times described herein, the acts alleged herein were inflicted by FAES officers under the Defendant's command, deliberately and intentionally, in furtherance of practices and policies authorized by the Defendant as President of Venezuela, under actual or apparent authority or color of law of Venezuela.

141. As the highest-ranking government official in the country, with command and control over the security forces, including FAES, Defendant Maduro directed, oversaw and/or controlled the officers who committed the extrajudicial killing of the Plaintiffs' family members, as well as the torture inflicted upon Plaintiffs Jane Doe 1, Jane Doe 3, and Jane Doe 4.

142. As outlined above, Defendant Maduro's role as President of Venezuela vested him with the responsibility and ultimate authority over all security and armed forces, including FAES. He had both the legal authority and practical ability to exert control over his FAES subordinates in Venezuela and thus had effective control over the direct perpetrators of these abuses.

143. Defendant Maduro knew, or at a minimum should have known, that torture and extrajudicial killing were being committed by his FAES subordinates and failed to prevent abuses or punish those responsible.

144. As President and commander of all armed and security forces in Venezuela, Defendant Maduro had the responsibility to ensure that the security forces under his command and control, like FAES, were not committing human rights violations against civilians, as well as

the power to investigate and punish individuals responsible for committing, ordering, or turning a blind eye to such abuses.

145. Defendant Maduro failed to investigate or punish FAES officers involved in the abuses outlined in the present complaint, and knowingly, publicly, and overtly encouraged and approved of FAES acts of violence.

146. Defendant Maduro authorized, tolerated, and knowingly ignored the murderous and torturous acts committed by FAES agents in furtherance of the Defendant's agenda to discriminate against impoverished civilians and maintain political control. The acts perpetrated against Plaintiffs' relatives were not isolated incidents but part of a widespread and systematic pattern of abuse directed against young, impoverished men. Such patterns of abuse can constitute crimes against humanity under customary international law if found to be part of a State-sanctioned or tolerated policy directed against a civilian population. The systematic and pervasive nature of the Defendant's acts underscores the severe violations of fundamental human rights norms.

## CAUSES OF ACTION

### Extrajudicial Killing under the TVPA

*All Plaintiffs, as representatives of their deceased relatives,*

*John Doe 1, John Doe 2, John Doe 3, John Doe 5, John Doe 6, and John Doe 7*

147. Plaintiffs reallege and incorporate by reference all allegations set forth above as if fully set forth below.

148. The executions of John Doe 1, John Doe 2, John Doe 3, John Doe 5, John Doe 6, and John Doe 7 constitute extrajudicial killing in violation of the Torture Victim Protection Act, codified at 28 U.S.C. § 1350 note.

149. The killings of the deceased John Does were not authorized by any court judgment, and each was unlawful under Venezuelan law at the time.

150. Prior to their extrajudicial executions, the deceased John Does were placed in imminent fear for their lives, and they suffered severe physical abuse.

151. The beatings and extrajudicial killings of the deceased John Does were perpetrated by Venezuelan officials—FAES officers—who operated under Defendant Maduro's command and control.

152. The manner in which the FAES officers tortured and executed the deceased John Does followed a pattern consistent with FAES's extrajudicial killings: the officers appeared in the deceased John Does' neighborhoods in the early morning, dressed in black and obscuring their faces; the officers stopped or entered the deceased John Does' properties without judicial or legal authority; under the cover of law, the officers executed the deceased John Does; the officers targeted each of the deceased John Does because they were young men living in impoverished neighborhoods and, as a group and without evidence, were imputed to be involved in criminal activities; the officers separated the deceased John Does from any family members who were present before executing them by gunfire; the officers then staged a confrontation in order to substantiate the fabricated narrative that the deceased John Does had "resisted authority;" and the officers in multiple cases then robbed the deceased John Does or stripped them of their identification.

153. The acts described herein were inflicted deliberately and intentionally by FAES officers, under Defendant Maduro's command, for the purposes of targeting, discriminating against and punishing John Doe 1, John Doe 2, John Doe 3, John Doe 5, John Doe 6, and John Doe 7 because they were young men living in low-income and impoverished neighborhoods. This

discrimination was deliberately obscured by unsubstantiated allegations that the deceased John Does were criminally involved.

154.    The extrajudicial killings of the deceased John Does caused each of the Plaintiffs to suffer emotional trauma, mental anguish, prolonged mental harm, and ongoing fear and insecurity. As a result, each Plaintiff has suffered damages in an amount to be determined at trial.

155.    Defendant's conduct was deliberate, willful, intentional, wanton, malicious and oppressive, and undertaken in reckless disregard of Plaintiffs' rights and well-being, warranting the imposition of compensatory and punitive damages in an amount to be determined at trial.

156.    Plaintiffs have attempted to pursue local remedies, but due to the lack of judicial and prosecutorial independence in Venezuela, such efforts have and remain futile. Despite the capture and detention of Defendant Maduro, it remains futile to seek a local judgment because the political situation remains unstable and highly uncertain. The individuals responsible for the creation of FAES remain in power today as high-ranking officials in Venezuela and Plaintiffs remain in fear of repercussions for pursuing local remedies. Moreover, even if a local judgment could be obtained, it would not be enforced and would very likely lead to further reprisal against Plaintiffs.

### Torture under the TVPA

*Plaintiffs Jane Doe 1, Jane Doe 3, and Jane Doe 4, representing themselves*

157.    Plaintiffs Jane Doe 1, Jane Doe 3, and Jane Doe 4 reallege and incorporate by reference all allegations set forth above as if fully set forth below.

158.    The acts perpetrated between 2017 and 2021 against Plaintiffs Jane Doe 1, Jane Doe 3, and Jane Doe 4 constitute torture in violation of the Torture Victim Protection Act, codified at 28 U.S.C. § 1350 note.

159.   Plaintiff Jane Doe 1 was subjected to torture in 2017, when FAES officers stormed her home in the early hours of the morning, forcibly removed her from the home and separated her from her son, and then detained her outside of her home while her son was being executed. Jane Doe 1's prolonged mental pain and suffering constitute torture under the Torture Victim Protection Act, 28 U.S.C. § 1350 note.

160.   Plaintiff Jane Doe 3 was subjected to torture in 2019, when FAES officers detained her outside of her son's home, refused to let her in to see him, and lied to her about her son's condition for hours. When she finally learned that her son had been executed, her distress was so great that it caused an intense physiological response, which required medical treatment and resulted in six months of incapacitation. Jane Doe 3's prolonged mental pain and suffering constitute torture under the Torture Victim Protection Act, 28 U.S.C. § 1350 note.

161.   Plaintiff Jane Doe 4 was subjected to torture in 2021, when FAES officers repeatedly and brutally beat her, threatened her with a gun in her face, and made her fear for her own life. Moreover, she was physically tortured while FAES officers were in her relative's home with her two brothers, and she both heard gunshots being fired at her brothers and observed one of her brothers' bodies being transported from the scene. Jane Doe 4 then confirmed the next day that both of her brothers had been executed by FAES, and saw their deceased bodies in the hospital. As a result of this traumatic experience at the hands of the FAES, Jane Doe 4 has lasting psychological trauma that compelled her, in part, to flee Venezuela and to pursue extensive therapeutic treatment. Her severe physical pain and prolonged mental pain and suffering constitute torture under the Torture Victim Protection Act, 28 U.S.C. § 1350 note.

162.   The acts described herein committed by the FAES under Defendant Maduro's direction and control were inflicted deliberately and intentionally not only because of the

Plaintiffs' actual or perceived relationship or association with young men living in impoverished neighborhoods, but also to punish Plaintiffs and their families for their actual or perceived criminality, to intimidate and coerce Plaintiffs and their communities in order to discourage resistance and complaints against government authorities, and to discriminate against Plaintiffs and their family members on the basis of their socioeconomic status, place of residence, and perceived criminal identity.

163. FAES's deliberate intimidation of Plaintiffs was part of its operational design. FAES intended to terrorize surviving members of victims' families in order to reduce the likelihood of interference with operations and to ensure that family members and entire neighborhoods were put in fear for their own lives should they report the violence or challenge government authority. In each of the Plaintiffs' cases, FAES intentionally isolated the Plaintiffs not only to ensure they could not save their family members, but also to increase their psychological suffering by ensuring they were kept away from their relatives while fearing that their relatives were being killed. These intimidation tactics effectively insulated the operations from outward critique and resistance.

164. FAES also intentionally and deliberately punished the Plaintiffs for their association with their deceased relatives. Plaintiffs were treated with suspicion due to their association with the targeted John Does, and as a consequence had their homes, belongings, and persons violated. In the case of Jane Doe 4, she was physically beaten for her attempts at intervening. This element of FAES's operational strategy meant that entire neighborhoods were aware of the personal risk involved in being associated with the young men and boys FAES targeted.

165. Finally, FAES deliberately and intentionally discriminated against the Plaintiffs

and their families for being low-income and living in impoverished neighborhoods. This discrimination was deliberately obscured by frequently unsubstantiated allegations that the Plaintiffs' deceased relatives were criminally involved, and as a consequence, made it futile for Plaintiffs to challenge FAES and seek accountability for their family members' killings.

166. The torture of Plaintiffs Jane Doe 1, Jane Doe 3, and Jane Doe 4 did not arise from and was not inherent in or incidental to lawful sanctions.

167. Defendant's violation of the TVPA caused Plaintiffs Jane Doe 1, Jane Doe 3, and Jane Doe 4 to suffer severe emotional trauma, mental anguish, prolonged mental harm, loss of educational and employment opportunities, and ongoing fear and insecurity. In addition, Jane Doe 4 suffered direct physical harm.

168. Defendant's conduct was deliberate, willful, intentional, wanton, malicious and oppressive, and undertaken in reckless disregard of Plaintiffs' rights and well-being, warranting the imposition of compensatory and punitive damages in an amount to be determined at trial.

169. Plaintiffs Jane Doe 1, Jane Doe 3, and Jane Doe 4 have attempted to pursue local remedies, but due to the lack of judicial and prosecutorial independence in Venezuela, a local judgment was and remains futile, and, consequently, any pursuit of local remedies would be futile and could lead to further reprisal against Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request entry of judgment in their favor and against DEFENDANT, inclusive, as follows:

A.      An order awarding Plaintiffs compensatory and punitive damages and their reasonable litigation expenses and attorneys' fees; and

B.      All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

A jury trial is demanded on all issues so triable.

Dated: June 30, 2026

Respectfully submitted,

_____
Sagar K. Ravi
Todd Harrison
Eli Berman
Alex Spisak (*pro hac vice* forthcoming)
Calvin Du (*pro hac vice* forthcoming)
Ethan Downs-Decker (*pro hac vice* forthcoming)
Hallie Fox (*pro hac vice* forthcoming)
McDermott Will & Schulte LLP
One Vanderbilt Avenue
New York, New York 10017
(212) 547-5400

Madelaine G. Altman (*pro hac vice* forthcoming)
The Guernica37 Centre for International Justice
Two Embarcadero Center, 8th Floor
San Francisco, CA 94111
madelainea@guernicacentre.org

*Attorneys for Plaintiffs Jane Doe 1, Jane Doe 2, Jane Doe 3, John Doe 4, and Jane Doe 4*